E X H I B I T   G

Copy of the Code of Medical Ethics,
Medical Services 68-MED-01 Police
Procurement of Medical Aids For Institution Rule 5120-9-27

EXHIBIT G

The Code of Medical Ethics of the American Medical Association (AMA) consists of three components:

1. The Principles of Medical Ethics
2. Ethical Opinions of the Council on Ethical and Judicial Affairs
3. Reports of the Council on Ethical and Judicial Affairs.

The first two of these are contained in the Code of Medical Ethics – Current Opinions published biennially (1). New Opinions, issued twice annually at meetings of the AMA's House of Delegates, are available through the Council on Ethical and Judicial Affairs (CEJA)'s website (www.ama-assn.org/go/ceja) and through AMA's electronic database Policy Finder. Reports are available separately.

## HISTORY                                                                     Go to:

The Oath of Hippocrates, a brief exposition of principles for physicians' conduct, dates from the fifth century BCE. Its statements protect the rights of the patient and oblige the physician voluntarily to behave in an altruistic manner towards patients. It was modified in the 10th or 11th century AD to eliminate reference to pagan deities and is used widely in a variety of forms to mark entry into the medical profession early in medical school or upon graduation to serve as a guide to ideal conduct for physicians.

In 1803, Thomas Percival, an English physician and philosopher, published a Code of Medical Ethics describing professional duties and ideal behavior relative to hospitals and other charities (2). At the initial meeting of the AMA in Philadelphia, PA in 1847, the two major items on the agenda were the establishment of a code of ethics and the enumeration of minimum requirements for medical education and training (3). The Code of Ethics adopted at that meeting drew heavily on Percival's Medical Ethics.

## PRINCIPLES OF MEDICAL ETHICS                                                 Go to:

The original 1847 Code retained its form, content, and principles through revisions in 1903, 1912, and 1947. A major change, with the intent of distinguishing between medical etiquette and medical ethics, appeared in the Principles of Medical Ethics adopted by AMA in 1957. This document contained only 10 short sections intended to provide a succinct expression of the basic concepts of its predecessor (Appendix A) (4).

The 1980 revision of the Principles represented an attempt to balance the dynamic tension between professional standards and legal requirements (5). It occurred in the milieu of legal actions ultimately adverse to the AMA, with judgments that its policies and acts in excluding associations between physicians and chiropractors constituted anticompetitive behavior (6). Section 3 of the 1957 Principles stated, "A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate professionally with anyone who violates this principle." This was replaced in the 1980 Principles by Principle V, "A physician shall continue to study, apply and advance scientific knowledge, make relevant information available to patients, colleagues and the public, obtain consultations, and use the talents of other health professionals when indicated" (5). And in Principle VI the statement "A physician shall...be free to choose ...with whom to associate..." appears. The 1980 Principles also introduced gender neutrality, replacing "he" and "his" with "the physician" and "the physician's" (Appendix B) (5).

The 2001 revision of Principles of Medical Ethics added two new principles. One emphasizes that a physician, while caring for a patient, regard responsibility to the patient as paramount. The other asserts

Case 1:22-mc-01371-JPG  Doc #: 4-10  Filed: 08/04/22  3 of 26.  PageID #: 41

that physicians should support access to medical care for all people (7). The 2001 Principles appear as Appendix C.

## ETHICAL OPINIONS OF THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS (CEJA) <span>Go to:</span>

The Principles of Medical Ethics are intended to address the elements of ethical behavior broadly and to be subject to alteration only infrequently; "(they) are not laws, but standards of conduct which define the essentials of honorable behavior for the physician" (1). Ethical Opinions issued by CEJA represent application of the Principles to specific issues and areas of professional activity. The environment of medical practice is ever changing and CEJA's Ethical Opinions are often revisited in light of new professional activities, new technology and procedures, and socioeconomic changes in the organization of medical practice.The Opinions are organized in the following sections:

  1.0 Introduction
  2.0 Opinions on Social Policy Issues
  3.0 Opinions on Interprofessional Relations
  4.0 Opinions on Hospital Relations
  5.0 Opinions on Confidentiality, Advertising, and Communications Media Relations
  6.0 Opinions on Fees and Charges
  7.0 Opinions on Physician Records
  8.0 Opinions on Practice Matters
  9.0 Opinions on Professional Rights and Responsibilities
  10.0 Opinions on the Patient-Physician Relationship

## REPORTS OF THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS <span>Go to:</span>

Reports of the CEJA provide discussion of and recommend ethical policies concerning the specific issue targeted by the report. They are initiated when new questions or issues are not covered adequately by existing Ethical Opinions, e.g. cloning; when there is non-clarity about how existing ethical policy should be applied to new situations, e.g. managed care; when existing policy is questioned by the profession; or when changes in the environment of practice require revisiting previous opinions.

Typically, topics under consideration for study by CEJA are presented at an Open Forum at the biannual meetings of AMA's House of Delegates with the agenda circulated in advance. Interested individuals are afforded the opportunity to provide input and advice on the topics. Those items that stimulate interest or controversy are selected for study.

Other issues stimulating study and issuance of a Report are those referred from the House of Delegates or Board of Trustees. CEJA Reports include in-depth study of the elements of the issue in question. Drafts of proposed Reports are often reviewed by ethical or technical consultants or by other AMA Councils for comment from their area of expertise. Reports of CEJA are discussed before Reference Committees of the House of Delegates before presentation to the House of Delegates. The House may accept a CEJA Report, reject it, or refer it back for additional study and revision, but it may not amend the Report. Upon adoption of a Report, the recommendations of the Report form the basis for an Ethical Opinion of CEJA which is issued at the succeeding meeting of the House of Delegates.

## THE COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS <span>Go to:</span>

In a rough analogy between the structure of AMA and that of the Federal Government, the Officers and the Board of Trustees constitute the Executive Branch; the House of Delegates the Legislative Branch; and CEJA the Judicial Branch. Oversight of the Code of Medical Ethics resides with CEJA, which is

charged with interpretation of the Principles of Medical Ethics and issuing and promulgating Opinions on ethical matters. Its opinions are not subject to approval by popular vote of the House of Delegates. In addition, CEJA is charged with interpretation of the AMA's constitution and bylaws. It has original jurisdiction in all questions regarding membership, on controversies under the constitution and bylaws and under the Principles of Medical Ethics in which AMA is a party, and in controversies between two or more state medical associations or their members. It has appellate jurisdiction in questions of law and procedure but not of fact in controversies between a constituent association and one or more of its component societies and between a member or members of a component society and that society.

Annually, each incoming President of the AMA presents a nominee for membership on CEJA to the House of Delegates, which may accept or reject, but not offer other candidates. Members serve a 7-year term and may not hold other offices within AMA during their terms. Membership, in addition to the seven senior physician members, includes a Resident Member and a Medical Student member, each eligible to serve a 3-year term so long as they are in the category of Resident or Medical Student. The prohibition against holding office, serving on other AMA Councils or Committees, or representing any association in the House of Delegates is intended to depoliticize CEJA and to help assure that AMA Ethical Policy is not subject to changes in the tide of popular vote. The Council elects its own Chair and Vice Chair.

CEJA limits its ethical pronouncements to physician activities and behavior, and AMA's Code of Medical Ethics does not purport to set standards or provide guidelines for ethical behavior for other health professions, health care institutions, purchasers or purveyors of insurance products, or those who manufacture drugs or medical equipment. This gives some limitations in this era in which forces affecting patient care are increasingly influenced by the government, complex health care organizations, insurers, and industry. It is clear that ethical precepts for physician activities and behavior apply equally to a single physician and to a practice composed of two or three physicians. It is much less clear that these precepts apply to 500 physicians in a practice governed under a corporate structure, and the interaction between expectation for physician behavior and organizational behavior remains a challenge to be addressed in future revisions of AMA's Code of Medical Ethics.

Issues addressed in recent years by CEJA Reports and subsequent Ethical Opinions include genetic testing, aspects of human cloning, conflicts of interest in clinical trials, ethical considerations in encouragement of donation of cadaveric organs for transplantation, interactions with and inducements from the pharmaceutical and medical device industry, electronic communication with patients, and issues of privacy and confidentiality of patients' personal medical information. AMA ethical policies on these topics may be referenced on CEJA's website or through AMA's Policy Finder.

A recent activity is the drafting, approval, and promulgation of the Declaration of Professional Responsibility (Appendix D) (8). This document, conceived in the wake of concerns following the disaster of September 11, 2001, offers to patients a pledge that the medical profession will be available to them in their times of need. The Declaration has been ratified by almost 100 state and specialty medical associations. AMA is in the process of presenting it to organizations representing physicians in other nations for their consideration and support.

## Appendix A American Medical Association Principles of Medical Ethics (1957) (4).

Go to:

These principles are intended to aid physicians individually and collectively in maintaining a high level of ethical conduct. They are not laws but standards by which a physician may determine the propriety of his conduct in his relationship with patients, with colleagues, with members of allied professions, and with the public.

Section 1. The principle objective of the medical profession is to render service to humanity with full respect for the dignity of man. Physicians should merit the confidence of patients entrusted to their care, rendering to each a full measure of service and devotion.

Section 2. Physicians should strive continually to improve medical knowledge and skill, and should make available to their patients and colleagues the benefits of their professional attainments.

Section 3. A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate professionally with anyone who violates this principle.

Section 4. The medical professional should safeguard the public and itself against physicians deficient in moral character or professional competence. Physicians should observe all laws, uphold the dignity and honor of the profession and accept its self-imposed disciplines. They should expose, without hesitation, illegal or unethical conduct of fellow members of the profession.

Section 5. A physician may choose whom he will serve. In an emergency, however, he should render service to the best of his ability. Having undertaken the care of a patient, he may not neglect him; and unless he has been discharged he may discontinue his services only after giving adequate notice. He should not solicit patients.

Section 6. A physician should not dispose of his services under terms of conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill or tend to cause deterioration of the quality of medical care.

Section 7. In the practice of medicine a physician should limit the source of his professional income to medical services actually rendered by him, or under his supervision, to his patients. His fee should be commensurate with services rendered and the patient's ability to pay. He should neither pay nor receive a commission for referral of patients. Drugs, remedies or appliances may be dispensed or supplied by the physician provided it is in the best interests of the patients.

Section 8. A physician should seek consultation upon request; in doubtful or difficult cases; or whenever it appears that the quality of medical service may be enhanced thereby.

Section 9. A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community.

Section 10. The honored ideals of the medical profession imply that the responsibilities of the physician extend not only to the individual, but also to society where these responsibilities deserve his interest and participation in activities which have the purpose of improving both the health and the well-being of the individual and the community.

## Appendix B American Medical Association Principles of Medical Ethics (1980) (5)                                    Go to:

### Preamble:

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility not only to patients, but also to society, to other health professionals, and to self. The following Principles adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician.

I. A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity.

II. A physician shall deal honestly with patients and colleagues, and strive to expose those physicians deficient in character or competence, or who engage in fraud or deception.

III. A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

IV. A physician shall respect the rights of patients, colleagues, and of other health professionals, and shall safeguard patient confidences within the constraints of the law.

V. A physician shall continue to study, apply and advance scientific knowledge, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

VI. A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical services.

VIII. A physician shall recognize a responsibility to participate in activities contributing to an improved community.

## Appendix C American Medical Association Principles of Medical Ethics (2001) (7)

Go to:

### Preamble:

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost, as well as to society, to other health professionals, and to self. The following Principles adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician.

I. A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.

II. A physician shall uphold standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.

III. A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

IV. A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.

V. A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

VI. A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.

VII. A physician shall, recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

VIII. A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

IX. A physician shall support access to medical care for all people.

Case 1:22-cv-01371-JPC   Doc #: 1-10   Filed: 08/04/22   7 of 26.   PageID #: 45

Appendix D Declaration of Professional Responsibility (8)                                    Go to:

Preamble:

Never in the history of human civilization has the well-being of each individual been so inextricably linked to that of every other. Plagues and pandemics respect no national borders in a world of global commerce and travel. Wars and acts of terrorism enlist innocents as combatants and mark civilians as targets. Advances in medical science and genetics, while promising great good, may also be harnessed as agents of evil. The unprecedented scope and immediacy of these universal challenges demand concerted action and response by all. As physicians, we are bound in our response by a common heritage of caring for the sick and the suffering. Through the centuries, individual physicians have fulfilled this obligation by applying their skills and knowledge competently, selflessly, and at times heroically. Today, our profession must reaffirm its historical commitment to combat natural and man-made assaults on the health and well-being of humankind. Only by acting together across geographic and ideological divides can we overcome such powerful threats. Humanity is our patient.

Declaration

We, the members of the world community of physicians, solemnly commit ourselves to:

1. Respect human life and the dignity of every individual.
2. Refrain from supporting or committing crimes against humanity and condemn all such acts.
3. Treat the sick and injured with competence and compassion and without prejudice.
4. Apply our knowledge and skills when needed, though doing so may put us at risk.
5. Protect the privacy and confidentiality of those for whom we care and breach that confidence only when keeping it would seriously threaten their health and safety or that of others.
6. Work freely with colleagues to discover, develop, and promote advances in medicine and public health that ameliorate suffering and contribute to human well-being.
7. Educate the public polity about present and future threats to the health of humanity.
8. Advocate for social, economic, educational, and political changes that ameliorate suffering and contribute to human well-being.
9. Teach and mentor those who follow us for they are the future of our caring profession.

We make these promises solemnly, freely, and upon our personal and professional honor.

| SUBJECT:<br>**Medical Services** | PAGE ___1___ OF ___18___ |
|---|---|
| | NUMBER: **68-MED-01** |
| RULE/CODE REFERENCE:<br>ORC 4723.43, ORC 4730, 5120.01 | SUPERSEDES:<br>68-MED-01 dated 06/1/2021 |
| RELATED ACA STANDARDS:<br>5-ACI-2A-03, 2C-12, 4A-01M, 4B-28M, 6A-01M,<br>5-ACI-6A-03 **thru** 6A-07, 6A-09, 6A-12M,<br>5-ACI- 6A-18M, 6A-20, 6A-22M, 6A-27, 6A-40,<br>5-ACI-6B-01M, 6B-02M, 6B-03M, 6B-11, 6B-12,<br>5-ACI-6C-01, 6C-03M, 6C-10, 6C-11, 6C-14M,<br>5-ACI-6C-15, 6D-01, 6D-04, 6D-06, 6D-08,<br>5-ACI-6D-09, 6D-10; 2-CO-4E-01 | EFFECTIVE DATE:<br>**March 14, 2022** |
| | APPROVED:<br>*a. C. Smith* |

**Ohio** | Department of<br>Rehabilitation & Correction

## I. AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II. PURPOSE

The purpose of this policy is to establish standard procedural guidelines for the delivery of medical services and the provision of unimpeded access to medical care for incarcerated individuals under the jurisdiction of the Ohio Department of Rehabilitation and Correction (ODRC).

## III. APPLICABILITY

This policy applies to all persons employed by or under contract with the ODRC (excluding DPCS, CTA, and OPI staff) and to all incarcerated individuals confined to institutions within the ODRC.

## IV. DEFINITIONS

The definitions for the below listed terms can be found at the top of the ODRC policies page on the ODRC Intranet at the following:

Definitions Link
- **Advanced Level Provider (ALP)**
- **Chief Medical Officer (CMO)**
- **Health Care**
- **Health Care Administrator (HCA)**
- **Intrasystem Transfer**
- **Medical Emergency**
- **State Medical Director**

| SUBJECT: **Medical Services** | PAGE 2 OF 18 |
|---|---|

## V.  POLICY

It is the policy of the ODRC to provide medical services and continuity of care to incarcerated individuals. Continuity of care is provided from admission to transfer or discharge from the facility and shall include referral to community-based providers when indicated. These services are to be accessible to all incarcerated individuals, include an emphasis on disease prevention, and reflect a holistic approach in accordance with approved levels of care.

## VI.  PROCEDURES

### A.  Governance and Administration

1. Responsibilities of Medical Operations

   a. The State Medical Director shall serve as the responsible physician and the medical authority for the ODRC and the medical services programs. The State Medical Director is responsible for the overall supervision of medical services.

   b. Medical Operations shall assist institution medical departments in the coordination of institution medical services.

   c. With input from institution field staff, Medical Operations shall utilize a health care staffing analysis to identify the types of health care providers necessary to provide the determined scope of services and essential positions needed to perform the health services mission in each institution.

   d. Medical Operations shall provide operational and fiscal support for all ODRC institution medical service programs.

   e. The Office of Correctional Health Care (OCHC) shall coordinate all medical continuous quality improvement activities within ODRC institutions.

   f. The OCHC shall manage equipment requests for institution health services.

   g. The OCHC shall coordinate the credentialing process for all advanced level providers (ALPs) including all physicians, dentists, ophthalmologists, podiatrists, nurse practitioners, clinical nurse specialists, and physician assistants.

2. Institution Health Authority

   a. The health care administrator (HCA) shall serve as the institution health authority.

   b. Responsibilities of the institution health authority shall include, but not be limited to, the following:

      i. Decisions about the deployment of health resources and the day-to-day operations of the medical services program, and

| SUBJECT: **Medical Services** | PAGE___3___ OF ___18___. |
| --- | --- |

    ii. Development of a mission statement that defines the scope of medical services, and

    iii. Development of mechanisms, including written agreements, when necessary, to ensure that the scope of services is provided and properly monitored, and

    iv. Adhere to and ensure all medical staff comply with ODRC policy and protocol, and

    v. Review health care policies and protocols on an annual basis, and

    vi. Development of institution medical procedures, when necessary, to address needs not addressed in ODRC policies. Each institution procedure and program in the institution's health care delivery system shall be reviewed, revised, if necessary, and signed at least annually by the HCA, and

    vii. Review of and input to the Medical Operations created institutional staffing plan at least annually to identify if the number and type of staff is adequate to provide the determined scope of services, and

    viii. Establishment of systems for the coordination of care among multidisciplinary medical providers, and

    ix. Development of an institutional Continuous Quality Improvement (CQI) program, and

    x. Coordination with institution administration to ensure that there is adequate space made available for administrative, direct care, professional, and clerical staff. Such space shall include access to a conference area, a records storage area, a public lobby, and toilet facilities, and

    xi. Equipment supplies, and materials necessary for health services are procured and maintained as determined by the HCA.

        a) Institution HCAs shall follow the purchase procedures outlined in PM-01, DAS Purchasing Procedures, for supplies not provided through the Ohio Department of Mental Health supply system.

        b) If the institution's medical budget is exhausted, yet additional equipment essential to the provision of quality medical care is needed, a Request to Purchase (DRC1918), an Equipment Justification (DRC5372), and a Budget Adjustment Request (DRC2303) for such equipment must be forwarded to Medical Operations.

    xii. And all other duties as assigned by the OCHC.

  c. The HCA shall be available to provide clinical and administrative supervision to institution medical staff 24 hours per day, 7 days per week. In the event the HCA is

DRC 1362

| SUBJECT: **Medical Services** | PAGE___4___ OF ___18___. |
| --- | --- |

not available to provide such supervision, the HCA shall arrange for back-up clinical and administrative supervision as follows:

    i. Designate the CQI coordinator to provide clinical and administrative supervision as acting HCA; or

    ii. Designate the assistant HCA or arrange with the appropriate institution deputy warden to provide administrative supervision of the institution medical staff as acting HCA and designate an experienced staff nurse to provide clinical guidance; or

    iii. Arrange with the HCA of a nearby ODRC institution for provision of clinical guidance and arrange with the appropriate institution deputy warden to provide administrative supervision of the institution medical staff.

3. Responsibilities of the Chief Medical Officer (CMO)

    a. The CMO shall have responsibility for all matters involving clinical judgment and shall not be countermanded by non-clinicians. The CMO shall provide clinical leadership for the provision of medical services in conjunction with the HCA.

    b. Additional responsibilities of the CMO include, but are not limited to:

        i. Coordinating on-call physician coverage 24 hours per day, 7 days per week - provides and shares on-call responsibilities, and

        ii. Adhere to and ensure all medical staff complies with ODRC policy and protocol, and

        iii. Conducts peer review/monitoring on institutional ALP at least every six (6) months, which shall include a review of ten (10) patient records.
           a) The CMO shall maintain these confidential reviews.
           b) These reviews shall not replace the OCHC biennial peer reviews.

        iv. Clinical care of the incarcerated individual population, and

        v. Evaluation of incarcerated individuals for referral consultations, and

        vi. Participation in collegial review process, per ODRC Medical Protocol B-1, Consultation Referrals, and

        vii. Review and act upon the recommendations of the specialty consultants, which may include modification of the recommendation or development of an alternative plan of care. The rationale for modifications or alternative plans of care shall be documented in the electronic health record (EHR), and

        viii. Monthly review of outstanding consults with the HCA, per ODRC Policy 68-MED-14, Specialty Health Care Services, and

| SUBJECT: **Medical Services** | PAGE___5___ OF ___18___. |
|---|---|

    ix. Review of all medical emergency transfers to outside hospitals on the next working day, with the HCA, and

    x. Review and approval of all medical restrictions, and

    xi. Provision of medical information/education to the health care and institutional staff, and

    xii. Provision of medical summaries or other written information, and

    xiii. Attendance and participation in institution and departmental meetings and committees, including the Pharmacy and Therapeutics committee, CQI committee, and quarterly administrative meetings, and

    xiv. Health Care policies and protocols review on an annual basis, and

    xv. All other duties as assigned by the OCHC.

4.     ODRC Medical Policy and Protocol

    a. Each policy, procedure, and program in the health care delivery system is reviewed at least annually by Medical Operations and revised, if necessary.

    b. Medical Operations shall develop, coordinate, and enforce system-wide medical service policies and protocols and shall provide direction related to health care issues.

    d. The State Medical Director shall be responsible for the review and revision of medical policies and protocols.

    e. The deputy director of Holistic Services shall be responsible for the review and revision of OCHC policies and protocols.

    f. Medical Operations shall be responsible for providing specific guidance and training/testing materials to all relevant field staff about substantive changes in medical policy or protocol.

        i. Each HCA shall ensure all institutional medical advanced level providers (ALP) and nurses receive OCHC-generated training and testing regarding new and revised medical/medical-related policies and protocols.

            a) Policy and protocol testing shall occur during the initial on-the-job-training period.

            b) Policy and protocol testing shall also occur upon new and updated policy and protocol releases; this testing shall be completed within thirty (30) days of the policy/protocol effective date.

        ii. Training and testing results shall be maintained and tracked through the CQI process.

DRC 1362

| SUBJECT: **Medical Services** | PAGE___6___ OF ___18__. |
|---|---|

    g.  The institution HCA and the CMO are responsible for ensuring each policy and protocol is implemented in accordance with ODRC guidelines.

    h.  The managing officer/designee shall be responsible for reviewing and revising any institution post orders required to ensure compliance with medical policy and protocol.

5.    Institution Medical Strategic Planning

    a.  As a part of the institution's medical program strategic planning process, each HCA and CMO shall develop measurable goals and objectives that shall be reviewed annually and updated as needed.

    b.  During the annual review, each HCA shall assess the achievement of established goals and objectives and document findings. Program changes shall be implemented, as necessary, in response to findings.

    c.  As detailed in ODRC Policy 08-MAU-01, Internal Management Audits, the internal management audit system shall be used to monitor compliance with department policies and established standards.

6.    Institution Administrative Meetings and Reporting Requirements

    a.  Each institution HCA and CMO shall meet with and submit reports to the managing officer, appropriate deputy warden, and a security representative at least quarterly to address communicable disease and infection control issues/activities, issues pertinent to medical services and health environment; and shall develop and submit plans to address issues raised. Additionally, the HCA shall review with the managing officer and appropriate deputy warden any newly adopted or revised policies and protocols.

    b.  Each institution HCA shall prepare and submit electronic monthly reports that include, but are not limited to, the following:
        i.   Referrals to specialists,
        ii.  Prescriptions written,
        iii. Laboratory and x-rays completed,
        iv. Infirmary admissions,
        v.  Off-site transports,
        vi. Transports to outside emergency departments,
        vii. Hospital admissions,
        viii. Serious injuries or illnesses, and/or
        ix. Deaths.

7.    Credentials Review

    a.  The HCA shall verify the licensure status of each licensed or certified employee annually, as outlined in ODRC Medical Protocol K-2, Credentialing and License Verification. Verification of current credentials and job descriptions shall be maintained on file in each facility.

DRC 1362

| SUBJECT: **Medical Services** | PAGE ___7___ OF ___18___ . |

    b.  The centralized background unit shall conduct a background investigation on all contractors, as outlined in ODRC Policy 34-PRO-07, Background Investigations. The results of this investigation shall be maintained in the contractor's file.

**B.**    **Incarcerated Individual Care and Treatment**

    1.  Vital signs (i.e., blood pressure, temperature, pulse, height, weight, and oxygen saturation levels) shall be completed on the patient and recorded for every medical encounter other than medication administration; specific vital signs appropriate to specific drug administration shall be completed as indicated by the drug parameters.

    2.  A complete medical, dental, and mental health screening shall be performed on each incarcerated individual, excluding intra-system transfers, at the time of the incarcerated individual's arrival at one of the ODRC's reception centers in accordance with ODRC Policy 52-RCP-06, Reception Intake Medical Screening.

    3.  Health appraisal data collection and recording shall include the following:

        a.  A uniform process as defined by the OCHC.
        b.  Health history and vital signs collected by health trained or qualified health care personnel.
        c.  Collection of all other health appraisal data performed only by qualified health professionals.
        d.  Review of results of the medical examination, tests, and identification of health-related problems is performed by an ALP.

    4.  Detoxification

        a.  Detoxification of alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted only under medical supervision at the facility or in a hospital setting when conditions warrant.

           i.  Detoxification procedures shall be implemented in accordance with ODRC Medical Protocol B-24, Medical Detoxification Guidelines.

          ii.  A referral to the Bureau of Correctional Recovery Services department located at that institution shall be electronically generated.

        b.  Incarcerated individuals experiencing severe, life-threatening intoxication (an overdose), or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.

           i.  A referral to the Bureau of Correctional Recovery Services department located at that institution shall electronically generated.

    5.  Intra-System Transfer Procedures: Reference ODRC Medical Protocol B-12, Intra-System Transfer and Receiving Process for specific process details.

DRC 1362

| SUBJECT: **Medical Services** | PAGE __8__ OF __18__. |
| --- | --- |

    a. Prior to any intra-system or interagency (i.e., ODRC to county jail or other correctional agency) transfer, a nursing assessment shall be completed on all incarcerated individuals to maintain the provision of continuity of care.

        i. The assessment shall include information about the patient's health condition, treatments, allergies, scheduled appointments, pertinent test results and prescribed medication.

        ii. The medical evaluation shall include a determination of the patient's suitability for travel, with particular attention given to communicable disease clearance.

    b. All prescribed essential medication shall be prepared in accordance with procedures outlined in ODRC Medical Protocol E-32, Preparation of Medication for Intra-System Transfers.

    c. Medical records shall be transferred with the patient and be handled in such a manner as to ensure confidentiality.

        i. Completed hard copy patient records shall be transported to the receiving institution.

        ii. Refer to ODRC Policy 07-ORD-11, Confidentiality of Medical, Mental Health, and Recovery Services Information, ODRC Medical Protocol E-32, Preparation of Medications for Intrasystem Transfer, and ODRC Policy 69-OCH-06, Electronic Health Record Utilization and Responsibilities for additional details.

    d. Upon arrival at a new institution, all incarcerated individuals shall be provided both oral and written instruction, in a language that is easily understood by each incarcerated individual, concerning access to medical care, the grievance process, copay requirements, and mental health services within the institution.

        i. Arrangements shall be made to provide this information to non-English speaking incarcerated individuals in a language they can understand.

        ii. When literacy or other communication problem exists, a staff member shall assist the incarcerated individuals in understanding the information.

    e. Receipt of orientation information given to patients shall be documented on the Medical Intake Signature Acknowledgement.

6. A registered nurse (RN) or ALP shall conduct a health screening on each patient upon arrival which includes, at a minimum, those items needed to complete the NSG-Nursing Intra-System Transfer Receiving Assessment within eight (8) hours of arrival at the receiving institution. Consistent with ODRC Policy 67-MNH-02, Mental Health Screening and Mental Health Classification, and ODRC Policy 52-RCP-06, Reception Intake Medical Screening, the initial mental health screening shall also be completed at this time.

7.　　Medical Needs During Transport

    a.　Correction officers shall not provide nurse-administered medications and medical treatments during transport of a patient.

    b.　The patient shall be permitted to retain certain self-carried medications in their possession, such as asthma inhalers and nitro-glycerin tablets, in accordance with ODRC Policy 310-SEC-03, Incarcerated Individual Transportation, and ODRC Medical Protocol E-32, Preparation of Medication for Intra-System Transfers.

    c.　Patients on oxygen maintenance therapies may be transported in ODRC vehicles to and from institutions/hospitals.

    d.　If the patient has a medical condition that requires a modification to the restraint procedures or any other special accommodations or precautions during transport, medical staff shall collaborate with the chief security officer/managing officer.

    e.　The chief security officer/designee shall ensure all special precautions are followed, including any required use of masks, gloves, or other protective equipment. Such notification should also be made any time during a patient's incarceration when the treating ALP diagnoses a medical condition requiring such accommodation.

8.　　General Medical Services

    a.　An ALP shall be on call 24-hours per day.

    b.　Patients who have complaints about medical issues shall follow the procedures outlined in Administrative Rule 5120-9-31, Inmate Grievance Procedure.

9.　　Sick Call Services

    a.　Incarcerated individuals shall be able to place requests for health services daily. Such requests shall be conveyed through readily available Health Service Request forms (DRC5373 or the electronic equivalent), which are triaged daily by medical staff, as outlined in ODRC Medical Protocol A-2.35, Nursing Sick Call Access.

    b.　A priority system shall be used to schedule clinical services, which shall be available to patients in a clinical setting at least five (5) days a week, including nurses and ALP sick call.

    c.　Clinical services shall be available to all incarcerated individuals in a clinical setting at least five (5) days a week by an ALP or other qualified healthcare professional.

    d.　No member of the correctional staff shall disapprove an incarcerated individual's request for attendance at sick call.

    e.　All Health Care encounters shall be conducted in a setting that respects patient privacy. Unless there is a known threat to the safety of healthcare staff, security staff shall maintain sound privacy by standing outside of the consultation area.

| SUBJECT: **Medical Services** | PAGE___10___ OF ___18___ |

 f. Licensed medical personnel are expected to practice within their respective scopes of practice at all times.

g. Staff medical resources shall be available through each medical services department.

10. Restrictive Housing

a. Security staff shall immediately notify medical staff when an incarcerated individual is transferred to a restrictive housing unit. The institution medical staff must approve the transfer of an incarcerated individual housed in the infirmary to a restrictive housing unit.

b. Medical staff shall provide review and assessment of each incarcerated individuals housed in a restrictive housing unit and log it.

   i. The Monthly Emergency Telephone Log (DRC5372) must be used, as outlined in ODRC Medical Protocol A-2.36, Nursing Telephone Triage.

   ii. In the incidence of an in-person review of the incarcerated individual, a log of the institution's design must be utilized.

c. Unless medical attention is needed more frequently, each incarcerated individual in restrictive housing shall receive a daily visit from a nurse.

   i. The visit ensures that incarcerated individuals have access to the health care system.

   ii. The presence of the nurse in restrictive housing shall be announced and recorded in the correction officer's log.

   iii. Nursing rounds and nurses sick call shall be conducted in each restrictive housing unit as outlined in ODRC Medical Protocol A-2.35, Nursing Sick Call Access.

d. Doctor's sick call shall be provided on a schedule that is determined by the HCA.

e. Medical appointments, diagnostic tests or other medical procedures shall not be cancelled or rescheduled because of restrictive housing unit admission without the approval of the CMO.

11. Infirmary Care

All institutions shall provide access to infirmary care either on-site or via transport to another facility. Specific procedural guidelines for infirmary care are outlined in ODRC Policy 68-MED-21, Infirmary Care.

12. Chronic Disease Management

   a. When incarcerated individuals are diagnosed with a chronic illness, institution ALPs shall develop a treatment plan that addresses the monitoring of medications, laboratory testing, health record forms, the frequency of specialist consultations and other guidelines outlined in the appropriate chronic care clinic protocol.

   b. A patient who requires close medical supervision, including chronic disease and convalescent care, shall have a written individualized treatment plan developed that includes directions to medical and other personnel regarding their roles in the care and supervision of the patient, and that is approved by the appropriate ALP.

   c. Chronic disease management strategies are outlined in ODRC Policy 68-MED-19, Chronic Disease Management, and in the chronic care clinic medical protocols.

13. Medical Emergency Services

   a. Each institution shall have a plan that assures that emergency medical, mental health, and dental services are available 24-hours per day.

   b. All correctional and healthcare personnel shall be trained to respond to health-related emergencies within a 4-minute response time. The training program is conducted on an annual basis and includes instruction on the following:

      i. Recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations; and
      ii. Administration of basic first aid; and
      iii. Certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization; and
      iv. Methods of obtaining medical/mental health staff assistance; and
      v. Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication, and withdrawal; and
      vi. Procedures for patient transfers to appropriate medical facilities or health providers; and
      vii. Suicide intervention.

   c. Specific procedural guidelines for provision of emergency services and emergency response training are outlined in ODRC Policy 68-MED-20, Emergency Services, ODRC Medical Protocol B-8, Guidelines for Assessment and Processing of Medical Emergencies, and ODRC Medical Protocol B-32, CPR Standards for Health Care Staff.

14. Sexual Assault

   a. When an incarcerated individual reports or is suspected of being the victim of a sexual assault, he/she shall be referred, under appropriate security provisions, to a community facility for treatment and gathering of evidence

DRC 1362

SUBJECT: **Medical Services**                          PAGE___12___ OF ___18__.

    b.  Specific guidelines for the management of a suspected sexual assault are outlined in ODRC Policy 79-ISA-01, Prison Rape Elimination, and ODRC Medical Protocol B-11, Medical Care Guidelines for Sexual Conduct or Recent Sexual Abuse.

15.   Pre-Release Guidelines

    a.  The count office shall notify the medical department, in writing, of an incarcerated individual's expiration of sentence or pending placement for the following month. Immediate notification shall be given on those occasions when an incarcerated individual is ordered released on a same day basis.

    b.  Prior to release, the incarcerated individual's medical record shall be reviewed, and a licensed nurse shall complete an electronic release medical summary for all incarcerated individuals who are released.

    c.  The ALP shall order, as outlined in ODRC Medical Protocol E-25, Dispensing Medication for Releases and Transfers, prescribed medical and mental health medication(s) that shall be issued to the incarcerated individual upon release from an ODRC institution.

    d.  If the patient is prescribed insulin, a Diabetic Going Home Kit shall be issued to the patient. If other injectable medication is prescribed, excluding all mental health injectable medications, the appropriate supplies shall be issued to the patient.

    e.  If the patient meets eligibility criteria, a Narcan Going Home Kit shall be issued to the patient.

    f.  Each institution health services department shall develop an institution specific procedure that promotes continuity of care after release. A list of referral sources shall be given to patients who require medical follow-up after release.

    g.  The release medical summary and education regarding medical follow up care needs shall be provided to all incarcerated individuals prior to release from the institution. Incarcerated individuals shall be provided medications prior to release from the institution.

**C.**    **Health Care Services and Support**

1.   Specialty Health Services

    a.  The CMO shall determine if a patient needs specialized healthcare services not available within the institution.

    b.  Patients who need specialized health care beyond the resources available in the institution, as determined by the responsible ALP, shall be transported under appropriate security provisions to a facility where such care is scheduled, on call or available 24-hours per day.

| SUBJECT: **Medical Services** | PAGE___13___ OF ___18___ . |
| --- | --- |

    c. Each institution shall develop a written list of referral sources, to include emergency and routine care. This list shall be reviewed and updated annually by the HCA.

    d. If the CMO determines medical services are needed that are beyond the scope provided by the medical department of the parent institution, he/she shall make the referral for patient transfer under appropriate security provisions to a facility where such care is available, as outlined in ODRC Policy 68-MED-13, Medical Classification.

    e. Hospital inpatient and specialty health services are provided by community providers, as outlined in ODRC Policy 68-MED-14, Specialty Health Care Services.

2. Ancillary Services

    a. Laboratory Services: The ODRC-contracted lab provides full service, high complexity laboratory testing for all institutions.

    b. X-ray services are available either on-site, at the Franklin Medical Center (FMC), in community facilities contracted by ODRC, or at institutions with privatized medical services.

    c. Dental services are available to every incarcerated individual as outlined in ODRC Policy 68-MED-12, Dental Services.

    d. Pharmacy services are provided for each institution as outlined in ODRC Policy 68-MED-11, Pharmacy Services.

    e. Exercise areas shall be available in each institution to meet the exercise and physical therapy requirements of individual patient treatment plans.

    f. Medical and/or dental adaptive devices (i.e., eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices) shall be provided when medically necessary, as determined by the responsible health care practitioner and through the collegial review process, as outlined in ODRC Medical Protocol B-1, Consultation Referrals.

3. Medical Transportation

    a. The safe and timely transportation of incarcerated individuals for emergency and routine medical, mental health, and specialty clinic appointments, both inside and outside the institution, is the joint responsibility of the managing officer/designee and the HCA.

    b. Each institution shall provide for transportation that assures access to medical services that are only available outside of the institution in accordance with ODRC Policy 310-SEC-03, Inmate Transportation, and ODRC Policy 68-MED-20, Emergency Services. Decisions concerning transportation shall incorporate the following requirements:

| SUBJECT: **Medical Services** | PAGE____14____ OF ____18____. |

     i. Prioritization of medical need: Referrals to specialty consults shall be designated as routine or to be scheduled within a specific timeframe within the EHR and processed in accordance with ODRC Policy 68-MED-14, Specialty Health Care Services and ODRC Medical Protocol B-1, Consultation Referrals.

     ii. The urgency of the medical need for ambulance versus standard transport as designated by the institutional ALP or other health care designee.

     iii. Medical escort shall be used to accompany security staff if necessary. If medical escort is required, ambulance transport must be used. Institutional medical staff shall not act as the medical escort.

     iv. The transfer of medical information shall be followed as outlined in ODRC Medical Protocol B-8, Guidelines for Assessment and Processing of Medical Emergencies, and ODRC Policy 68-MED-14, Specialty Health Care Services.

**D.     Health Promotion and Disease Prevention**

1.     Each institution shall offer an ongoing program of health education and wellness information to all offenders.

2.     Each institution shall also offer a holistic services fair annually for incarcerated individuals, which may include informational booths, speakers, and access to free health screenings.

     a. Participation and attendance of all institutional holistic services areas, which includes education, medical, mental health, religious and recreational services, and recovery services, is mandatory.

     b. Medical services shall coordinate the event.

     c. Holistic services fair admission shall be extended to family and support persons of incarcerated individuals and community partners.

     d. Notification of the holistic services fair shall be publicized in incarcerated individual common areas at least thirty (30) days prior to the holistic services fair.

     e. A list of activities/booths offered during the holistic services fair shall be publicized.

     f. Incarcerated individual participation shall be captured via individual signatures.

3.     Periodic Examinations

     a. Every institution shall make periodic physical examinations available to all incarcerated individuals as outlined in ODRC Medical Protocol B-5, Health Examination Guidelines for Inmates.

     b. Appropriate patient education regarding health maintenance and disease prevention shall be made available to incarcerated individuals during the physical examination.

| SUBJECT: **Medical Services** | PAGE __15__ OF __18__ . |

4.    Medical staff shall collaborate with other areas of the OHS to ensure the holistic needs of the incarcerated individuals at the institution are met.

Medical staff shall participate in a holistic family event at least quarterly.

a.    Each quarter, a different service area under holistic services shall be responsible for coordinating the event.

b.    The event shall be extended to family and support persons of incarcerated individuals and community partners, when applicable.

c.    When medical services are not responsible for coordinating the quarterly event, it shall be an active participant in the event by providing materials, information, staff, and other needed items to ensure medical services is appropriately represented.

**E.    Personnel and Training**

1.    Institution Medical Staffing

a.    A staffing plan for each institution shall be developed through Medical Operations from a staffing analysis that defines the scope of services to be provided and determines the essential positions needed to perform the medical services mission. The HCA shall review this staffing plan with Medical Operations at least annually to provide input in determining if the number and type of staff is adequate.

b.    Adequate health care personnel shall be available within the institution for health assessments, medication administration, triaging of complaints and problems, chronic care, management of emergencies, and follow-up services.

c.    Written job descriptions shall be prepared by the OCHC for qualified health care staff and approved by the HCA. These job descriptions are reviewed with each employee upon hire and annually at the time of the employee's performance evaluation.

d.    The specific duties and responsibilities of health care staff shall be clearly defined and delineated.

e.    Work assignments shall be developed in compliance with the licensee's scope of practice.

f.    Nursing students, medical students, and interns delivering medical care in the institution shall work, commensurate with their level of training, under the direct supervision of a clinical instructor who is responsible to the HCA.

i.    There shall be a written agreement between the ODRC, coordinated and approved through the OCHC prior to student/intern placement, and the training or educational facility, that covers the scope of work, length of the agreement, and any legal or liability issues.

| SUBJECT: **Medical Services** | PAGE___16___ OF ___18___. |

      ii.  Students or interns shall agree in writing to abide by all facility policies including those relating to the security and confidentiality of information.

      iii.  For additional details, refer to ODRC Policy 38-CED-05, Internship Guidelines.

  g.  Incarcerated workers are restricted to defined job duties within the health care area and shall work under the supervision of the custody staff. Incarcerated individuals shall <u>not</u> be used for the following:

      i.  Performing direct patient care services, except under direct supervision by qualified staff as part of an apprenticeship program.
      ii.  Any duties that allow direct or indirect access to confidential medical information.
      iii.  Scheduling health care appointments.
      iv.  Any activity that determines access of other incarcerated individuals to health care services.
      v.  Handling or having access to surgical instruments, syringes, needles, medications, or health care records.

  h.  Upon receiving appropriate training developed by the HCA and approved by the regional nurse administrator (RNA), incarcerated workers may perform familial duties commiserate with their level of training. These duties may include:

      i.  Peer support and education.
      ii.  End-of-Life Care activities, including service as a companion, letter writing, and reading.
      iii.  Assist impaired incarcerated individuals on a one-to-one basis with basic life functions/activities of daily living, which may include but is not limited to:
          a)  Assisting vision-impaired incarcerated individuals with communication facilitation, ambulatory guidance, spatial awareness, organization of personal property, etc.; or
          b)  Assisting mobility-impaired incarcerated individuals with ambulatory guidance, wheelchair maneuvering, transportation of items, organization of personal property, etc.; or
          c)  Assisting hearing-impaired incarcerated individuals with communication facilitation, spatial and auditory awareness, etc.; or
          d)  Assisting speech-impaired incarcerated individuals with communication facilitation, etc.
      iv.  Serving as a suicide companion or buddy if qualified and trained through a formal program that is part of a suicide-prevention plan.
      v.  Optometric assistance, as part of ODRC's eyeglass fabrication processes, when directly supervised and in compliance with applicable tool control policies.
      vi.  Denture fabrication, when directly supervised and in compliance with applicable tool control policies.

2.    Continuing Education and Staff Development

  a.  The HCA shall work with the institution training department and the security chief to ensure all health care personnel are training in the implementation of the institution's medical emergency plans.

DRC 1362

| SUBJECT: **Medical Services** | PAGE___17___ OF ___18___. |

    b. Health care personnel must participate in annual training drills of the medical services delivery aspects of the critical incident management plan.

    c. Medical staff is encouraged to take advantage of the various medical in-service training classes officered by the department. Staff development classes are regularly offered at the Corrections Training Academy (CTA). A schedule of these classes is available in the CTA catalog if class offerings.

**F.    Special Medical Considerations**

    1.    Security of Medical and Dental Equipment

        a. Security of all medical and dental equipment and instruments is of paramount importance. Medical and dental staff shall conform to the procedures outlined in ODRC Policy 310-SEC-36, Tool Control, and to each institution's specific tool control procedures.

        b. All medical and dental staff shall adhere to the procedures outlined in ODRC Medical Protocol E-2, Pharmacy Administrative Operations.

    2.    Second Opinions/Private Pay

        a. Incarcerated individuals do not have the option to receive a second opinion in medical matters. Likewise, a "private physician" is not permitted to treat an individual while incarcerated.

        b. Incarcerated individuals generally do not have the option to purchase or receive prescription medication or medically related items from outside sources. Certain medically indicated devices may be authorized on a case-by-case basis. Such exceptions may include, but are not limited to:

            i. Back or knee braces,
            ii. CPAP machines,
            iii. Nebulizer compressors,
            iv. Eyeglasses (note: ODRC does <u>not</u> provide contact lenses to incarcerated individuals unless medically indicated),
            v. Specialized wheelchairs, and
            vi. Other medically necessary equipment that meets security requirements, if authorized by the institution's chief of security, the HCA and CMO.

        c. Health care insurance programs in place prior to the incarcerated individual's incarceration may be accessed for medical services while the individual is incarcerated by the ODRC. Decisions about seeking reimbursement from third party payers shall rest with the OCHC and shall be considered on a case-by-case basis.

| SUBJECT: **Medical Services** | PAGE___18___ OF ___18___. |

**Referenced ODRC Medical Protocols:**

A-2.35   Nursing Sick Call Access
A-2.36   Nursing Telephone Triage
B-1      Consultation Referral
B-5      Health Examination Guidelines for Inmates
B-8      Guidelines for Assessment and Processing of Medical Emergencies
B-11     Medical Care Guidelines for Sexual Conduct or Recent Sexual Abuse
B-12     Intra-System Transfer and Receiving Process
B-24     Medical Detoxification Guidelines
B-32     CPR Standards for Health Care Staff
E-2      Pharmacy Administrative Operations
E-25     Dispensing Medication for Releases and Transfers
E-32     Preparation of Medication for Intra-System Transfers
K-2      Credentialing and License Verification

**Referenced ODRC Policies:**

07-ORD-11   Confidentiality of Medical, Mental Health, and Recovery Services Information
08-MAU-01   Internal Management Audits
34-PRO-07   Background Investigations
38-CED-05   Internship Guidelines
52-RCP-06   Reception Intake Medical Screening
67-MNH-02   Mental Health Screening and Mental Health Classification
68-MED-11   Pharmacy Services
68-MED-12   Dental Services
68-MED-13   Medical Classification
68-MED-14   Specialty Health Care Services
68-MED-19   Chronic Disease Management
68-MED-20   Emergency Services
68-MED-21   Infirmary Care
69-OCH-06   Electronic Health Record Utilization and Responsibilities
310-SEC-03  Incarcerated Individual Transportation
310-SEC-36  Tool Control

**Referenced Forms:**

Request to Purchase                      DRC1918
Budget Adjustment Request                DRC2303
Monthly Emergency Telephone Log          DRC5372
Health Service Request                   DRC5373

EXHIBIT G

# Rule 5120-9-27 | Procurement of medical aids for institution inmates.

Ohio Administrative Code  /  5120  /  Chapter 5120-9 | Use of Force; Institutional Rules

*Effective:* April 1, 2005    **Promulgated Under:** 111.15

(A) The department of rehabilitation and correction shall provide to all institution inmates, when it is determined by qualified departmental staff (or other qualified independent contractor) that a legitimate medical or dental need exists, the following medical aids: eyeglasses, full and/or partial dentures, hearing aids, orthopedic appliances, etc. The department will further provide for reasonable replacement and upkeep. The cost and quality of such replacement items shall be at the warden's discretion. An inmate may, with the warden's approval, obtain a higher quality or more expensive item at the inmate's own expense.

(B) The loss, theft or destruction of such aids, due to carelessness or negligence on the part of the inmate, will result in replacement being charged to the inmate's personal account. Prior to any such action, however, a full investigation will be conducted by the inspector of institutional services.

(C) Medical aids of a cosmetic nature are not provided for. The cost of cosmetic medical aids, if desired by the inmates will be charged to the inmate's personal account with prior approval of the warden.

## Supplemental Information

**Authorized By:** 5120.01
**Amplifies:** 5120.01
**Five Year Review Date:** 1/10/2025
**Prior Effective Dates:** 2/16/1973, 1/13/1979